IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 17, 2013 Session

**STATE OF TENNESSEE v. TERRENCE JUSTIN FEASTER**

**Appeal from the Criminal Court for Knox County**
**No. 97484      Jon Kerry Blackwood, Senior Judge**

---

**No. E2012-02636-CCA-R3-CD - Filed May 23, 2014**

---

Appellant, Terrence Justin Feaster, stands convicted of attempted voluntary manslaughter, aggravated assault, and false imprisonment, for which he received consecutive sentences of twelve years as a career offender, fourteen years as a persistent offender, and eleven months, twenty-nine days, respectively. In this appeal, he challenges the sufficiency of the evidence underlying his convictions for attempted voluntary manslaughter and aggravated assault. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. JOSEPH M. TIPTON, P.J., filed a separate opinion concurring in part and dissenting in part.

Joseph A. Fanduzz, Knoxville, Tennessee, for the appellant, Terrence Justin Feaster.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Randall Eugene Nichols, District Attorney General; and Leslie Nassios and Federico Flores, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case involves the attempted voluntary manslaughter, aggravated assault, and false imprisonment of the victim, Molly Kate McWhirter, at her home in Knox County on May 27, 2010. For his involvement in these offenses, a Knox County grand jury indicted appellant for one count of attempted first degree murder, two counts of especially aggravated kidnapping, one count of aggravated robbery by causing serious bodily injury, and one count of aggravated assault by causing serious bodily injury. *See* Tenn. Code Ann. §§ 39-12-101, -13-202, -13-305, -13-402, -13-102. Following a trial, the jury found appellant guilty of attempted voluntary manslaughter, a lesser included offense of attempted first degree murder,

a Class D felony; false imprisonment by confining the victim, a lesser included offense of especially aggravated kidnapping, a Class A misdemeanor; and aggravated assault, a Class C felony. The jury returned verdicts of not guilty for aggravated robbery and the remaining count of especially aggravated kidnapping based on removal of the victim. The trial court sentenced appellant to consecutive terms of twelve years for attempted voluntary manslaughter, fourteen years for aggravated assault, and eleven months, twenty-nine days for false imprisonment.

## I. Facts

The State's first witness was Bill Chaffins, the victim's next-door neighbor. Mr. Chaffins testified that in the early morning hours of May 27, 2010, he was awakened by someone knocking on his door. Unable to ascertain the identity of the person knocking, Mr. Chaffin went outside and observed the victim as she "basically collapsed." Her hair was matted together, and she had many injuries. Mr. Chaffin said that he could not recognize the victim at first and that it was only after he heard her voice that he knew the victim's identity. Mr. Chaffin asked the victim who had inflicted the injuries upon her, and she answered that it was "Terry," the man who was living with her at the time. He stated that it was difficult to understand the victim because of the extent of her injuries. Mr. Chaffin then called 9-1-1.

Officer Brian Baldwin with the Knoxville Police Department testified next and stated that he responded to the call at Mr. Chaffin's address on May 27, 2010. When he arrived, he observed the victim lying on the front porch. She was "visibly bloody," and her eyes had already begun to swell. Officer Baldwin called for an ambulance. Despite the victim's inability to speak in complete sentences, Officer Baldwin gleaned that the offenses had occurred at her home, which was next door to Mr. Chaffin's residence. The victim reported having been robbed and tied up by appellant, whom she described as approximately thirty-three years of age.

On cross-examination, Officer Baldwin acknowledged that while he was at the scene, dispatch advised that another 9-1-1 call had been received, wherein the caller reported that four black males had been seen running from the victim's residence.

Detective John Kiely with the Knoxville Police Department testified that when he first responded to Mr. Chaffin's address, he observed Officer Baldwin speaking with the victim, who had already been placed on the gurney by medical personnel. Upon information from Officer Baldwin, Detective Kiely became aware that a large dog with a litter of puppies was located within the victim's home. Officers surrounded the home in the event a suspect attempted to flee the scene, but they did not enter the home at that time because of the concern that an officer might be bitten by the dog. They summoned an animal control officer to the scene, who assisted by taking control of the dogs as officers entered the home.

Although it did not appear that the dogs had compromised the integrity of the crime scene, Detective Kiely noticed a smear of blood beside the dog bed in the kitchen.

Photographs and diagrams were admitted into evidence through Officer Dan Crenshaw of the Knoxville Police Department's Forensic Unit.

Dr. William Snyder, Jr., a neurosurgeon who practiced primarily at the University of Tennessee ("UT") Medical Center, consulted on the victim's case the day after she was admitted. He testified that the victim sustained a head injury, a bilateral nasal fracture, multiple lacerations, bilateral pulmonary contusions, a vitreous hemorrhage, and soft tissue injuries to her arms. She also sustained a temporal skull fracture, which is a fracture of the temporal bone behind the eye. The temporal skull fracture caused a pneumocephalus, which is air trapped in the skull, and a subarachnoid hemorrhage, which is bleeding into the spinal fluid. Dr. Snyder noted that secondary to the bilateral nasal fracture were a hemorrhage to the left maxillary sinus and a hemorrhage to the nasopharynx, the nose and mouth area. The bilateral pulmonary contusions meant that the victim had bruising on her lungs. The vitreous hemorrhage indicated bleeding in the clear area, or vitreous, of the eye. Dr. Snyder opined that the victim's injuries were consistent with an assault.

Dr. Snyder indicated that the victim had already undergone procedures to staple the lacerations on her head and to stitch the lacerations on her face before he saw her the following day. Because none of her injuries required neurosurgical intervention, he monitored her condition but did not prescribe any treatments.

Kelly Griffin, a registered nurse with the UT Medical Center, recalled that the victim arrived by ambulance and that she had several large lacerations on her forehead and around her scalp. The victim's condition was unstable, so she required intubation to assist her breathing. The victim's reading on the Glasgow Coma Scale, which is used to indicate a patient's level of consciousness, was seven, a level at which intubation was necessary to support lung function. Medical personnel performed a rapid sequence intubation on the victim because of her decreasing level of consciousness. Ms. Griffin was initially unable to obtain a blood pressure reading, which was indicative of insufficient blood flow to the brain. Ms. Griffin stated that she had one large laceration on her head measuring approximately twenty-five centimeters in length with "quite a bit" of blood loss attendant thereto, which contributed to the decrease in consciousness.

Ms. Griffin indicated that one of the "cardinal signs" of a brain injury is the presence of vomiting and that the victim's chart stated that she had, in fact, vomited, sometime after she was admitted. She also recalled that when the victim was transported by ambulance, she had a classification of "full alert," which was the "most dangerous level of condition that a

patient could be in." Ms. Griffin testified that the victim was hospitalized for thirteen or fourteen days.

Colin McLeod, an investigator with the Knoxville Police Department, was assigned to investigate this case. Upon his arrival at the victim's home, he noticed an air mattress that had a "fair amount" of blood on it located in a "front room." Between this room and an adjacent bedroom, he noticed a large towel or bath mat that was "really quite saturated in blood." A long television cable ran from the front room to the bedroom, and a large loop was formed in the cable near the bloody towel. Investigator McLeod recalled that there was more blood in the bedroom. He saw more cables on the bed that appeared to be extension cord cables, as well as wires adjacent to the television area in the bedroom. Dresser drawers in the bedroom appeared to have been pulled out and only partially pushed back in. Two drawers from a jewelry box on top of the dresser had been removed and dumped upside down. He found an unspent bullet in the third drawer but not a weapon. He noted that the bedroom, in turn, led to a den that further connected to a bathroom and the kitchen.

Investigator McLeod testified that "there was a significant amount of blood on the floor" of the bathroom and that there were bloody handprints on the floor, as well. He stated that blood was splattered on the vanity, on the bathtub, and on the shower curtain. He observed "drips of blood on the floor as if somebody had . . . just been freely dripping blood onto the floor, and then there was a large drag mark of blood that appeared to lead from the kitchen area into the den area that was several feet long."

Investigator McLeod attempted to locate something by which he could identify the victim, but he was unable to find a wallet or purse at that time. On his second search of the home, he identified some paperwork with the victim's name on it but nothing with a photograph, so he could not positively identify the victim at that time either. The name on the paperwork matched the registration of the vehicle outside the victim's residence, but ultimately, friends who visited the victim at the hospital provided the positive identification of the victim.

When he visited the victim at the hospital, Investigator McLeod had developed appellant as a suspect. Upon seeing the victim, he observed that "[h]er eyes were swollen and bulging out. Her eyelids were actually partially open[,] and she had blood running from her eyelids so you could see her iris and blood running out almost as if they were tears." He also noticed "very large open wounds" on the victim's forehead, open wounds on her temple, and a "significant amount of blood" along her hairline. He stated that the victim's hair was long enough that it concealed some of the injuries about which he learned at a later time. Investigator McLeod also saw that the victim's hands were bruised and swollen. She was not conscious at the time, and she was unable to speak with him during that visit.

Investigator McLeod testified that he visited the victim on May 28 because he was notified that she had regained consciousness and wanted to speak with an investigator. He stated:

> She was obviously in pain, in my opinion. She couldn't move her hands, and her eyes were still swollen to the point where she had difficulty seeing me. She seemed confused and dazed to a point where she may have been under some level of sedation or pain medication. Plus it appeared since she had such a - in my opinion[,] a severe head injury, I wouldn't be surprised if she was in and out of consciousness at that point, but she was able to make a statement.

Based on information Investigator McLeod had received to that point, he pursued several avenues in an attempt to locate appellant. He eventually spoke with appellant by telephone on June 4, when someone who identified himself as appellant called and stated that his family had advised him that law enforcement personnel were looking for him. Investigator McLeod advised appellant that there was a warrant for his arrest and that appellant needed to give his side of the story. Appellant immediately disconnected the call, and the telephone was not available for call-back after that. Investigator McLeod had appellant entered into a national crime database as having a fugitive warrant against him to ensure that he would be extradited to Tennessee if he were to be detained in another state. Appellant was detained on a traffic stop in South Carolina on July 8, 2010.

The State next called James Courtney, who testified that he was present at the victim's residence on May 26, 2010, to assist in building a "dog box" for the victim's dog and puppies. Appellant was present and helped him with the construction. They placed the dog box in the kitchen. He observed appellant interact with the victim and characterized it as "fine" and "normal."

The next time he saw the victim was the following day at the hospital. He had been summoned to the hospital to identify the victim because no one had been able to do so. He could not recognize her; he had to roll the victim over to see the tattoo on her shoulder to identify her. He said, "[H]er head looked like a watermelon[,] and she had bandages, of course, and swollen to the point that I couldn't recognize her." The victim was unconscious at that time.

Mr. Courtney stated that since that time, the victim's memory had become "scarce." She was unstable on her feet and often had to "grab the walls or take really short distances to walk." She also bore several disfiguring scars. Mr. Courtney said that he and the victim had become closer friends since the incident, and he opined that she still had sporadic memory problems and still "wobbled" when she walked.

The State called the victim as its last witness. She testified that she had known appellant for approximately three weeks at the time of the incident. He had "stayed" there "for a couple of weeks[,] [but] [h]e didn't live there." Appellant kept some articles of clothing at her home.

The victim recalled that on the day in question, Mr. Courtney and appellant had built a dog box for her dog. The victim explained that her dog was a Japanese Akita and that she had been professionally trained to be "her dog." When the dog had puppies, the victim blocked off the kitchen and allowed the dog to remain in the kitchen so that the dog would feel "safe" with her puppies. After Mr. Courtney left, a girlfriend came over and brought food and vodka. Appellant and the victim's friend drank the vodka, but the victim did not drink vodka, so she did not partake.

Later in the evening, the victim and appellant decided to go to Ray's, a sports bar and grill where the victim often played pool. They took appellant's car, and the victim drove. At that point, the victim thought that everything seemed "fine." They arrived around 12:00 or 1:00 a.m., but they did not stay more than an hour because no one was playing pool, so the victim wanted to go home. The victim had "a couple of shots" of tequila that night and may have smoked marijuana at some point during the day. Nonetheless, she recalled that she was "completely sober." When the victim and appellant left Ray's, appellant was "really drunk," so she drove his car. Rather than getting into the car, appellant began walking. The victim drove up to him, and he entered the car at that time.

The victim testified that when they arrived home, she went into the bathroom, and appellant broke through the door and "just started beating [her]." She recalled lying on the floor on her back and holding her hands up. She recalled waking up in the dining room but did not know how she got there. When she awakened, her head was resting on the air mattress as though it were a pillow. The victim also remembered being dragged into the bedroom at one point. Appellant had covered her head and tied her feet to the entertainment center with an electrical cord. He told her that if she moved, he would kill her. At one point, the victim asked for help, and appellant stated, "'Yeah, I'll get you some help, ha, ha, I'll get you help.'" The victim lost consciousness thereafter. When she regained consciousness, she did not hear any noises, so she untied her ankles and "stumbled" to her neighbor's house. She remembered "flipping" over his fence, "beating" on his door, and subsequently being loaded into the ambulance. She awakened three days later.

When the victim was released from the hospital, she returned to her home and noticed several items missing: her "good" jewelry, which included "a few Tiffany's pieces, a couple of rings, [and] bracelets"; her purse, which contained her car keys, house keys, identification, and telephone; rent money that she had kept in her jewelry box; her computer; and twenty to thirty football jerseys, which the victim described as "NFL jerseys, Stubbles, the expensive

-6-

ones." She never recovered her telephone, and she had to have a mechanic replace the steering column and locks in her car. While she was hospitalized, the victim gave only Jay Courtney permission to enter her home for the purpose of feeding her dog.

The victim explained the effect that her injuries had on her, stating that "[her] memory [had] been affected real [sic] bad, balance, hearing, [her] eyesight[,] . . . [a]ll [her] scars, they're horrible." She also continued to experience "horrible headaches[] every day . . . ."

On cross-examination, the victim stated that she did not recall having argued with appellant after they returned to her home from the bar. She denied that they called each other names and that she threatened appellant with a gun. She admitted that she owned a gun but said that she did not have it with her at the time and that she did not "pull guns on people." Following the victim's testimony, the State rested its case-in-chief.

Appellant testified on his own behalf and stated that he met the victim at a gas station, where they exchanged telephone numbers. The following day they spoke by telephone, and the victim invited him to join her at Ray's. They began dating "[p]retty much . . . the same night." He did not spend that night with the victim, but he stayed at her house the following two nights, after which the victim told him to bring over some of his belongings. He continued to stay at the victim's house until the incident in question, which was approximately two weeks later.

Appellant testified that on the day of the offenses, he, the victim, and Mr. Courtney built a dog box for the victim's dog and puppies. The victim ran errands, and people visited during the day. Later in the night, they went to Ray's. Appellant indicated that Mr. Courtney was present, as well as a man known as "D." According to appellant, the victim "acted like she kind of knew [D.] or wanted to know him . . . ." He said that they remained at Ray's for approximately two hours and that while they were there, they played video games and played pool.

Appellant explained that when they left Ray's, he left alone because the victim "did something very disrespectful. She went outside twice with this gentleman, D." The first time, D. had gone outside first, and the victim followed him. She re-entered Ray's approximately fifteen minutes later. The second time, after the victim placed an order for food, she went outside with D. again, "[a]nd she stayed out and stayed out there . . . ." Appellant walked outside to see what the victim was doing, and he observed the victim sitting in appellant's car with D., which angered and embarrassed him. Appellant then began walking, and the victim pulled up in his car shortly thereafter. Appellant stated that the victim "begged" him to get into the car with her, but he refused. He instructed her to pack his belongings and place them on the porch when she arrived home. Upon the victim's repeated requests for him to get into the car, he acquiesced. Appellant recalled that the

victim was under the influence but that he was not intoxicated.  He believed that the victim had drunk three or four "double shots" of tequila.

Appellant stated that he and the victim argued as they drove home.  He leapt from the car before she had fully stopped, entered the house, and began packing his belongings.  He admitted making "derogatory remarks towards her" at that time.  He said that they were "calling each other names" and that he "was letting her know that [her] actions . . . at the club [were] not very lady[-]like . . ." whereupon the victim "punched" him in the face.  Appellant laughed at her and provoked her further, prompting the victim to punch him a second time.  Appellant claimed that he then advised the victim that if she continued punching him in the face, "she's putting herself in the position of a man, so please, don't touch me in my face anymore . . . ."  Nonetheless, the victim punched him a third time.  Appellant then hit the victim "right in the nose."  He recounted that the victim then lost control, obtained her gun, and cocked it as though she intended to shoot him.  As he attempted to grab the gun from her, they struggled.  He eventually wrestled the gun from the victim's grasp, but the victim was still fighting.  Appellant stated that the victim bit him in the chest and that he struck the victim with the pistol because "she had locked onto [him]."  The victim "backed off" from him, but appellant began hitting her again when the victim "rushed" him.  Appellant stated that he felt "threatened" by the victim.

Appellant expounded:

After the pistol came into play, it got so physical at that time that it didn't stop until she was down, she was on the ground, and she actually – when it stopped, I hit her and pushed her so hard, I pushed her into the bathroom.  We [were] right outside the bathroom, right outside the door of the bathroom and the utility room . . . .

Appellant recalled that the victim was visibly injured at that point.  She complained that her head was "ringing" and her hand hurt.  Appellant said that he was crying when he asked the victim why she had threatened him with a gun and that she apologized for doing so.

Appellant maintained that after the physical altercation ended, the victim requested that he summon 9-1-1 because she needed help.  He stated that the victim asked that he first remove all of the drugs and guns from her property.  According to appellant, the victim had been selling drugs at Ray's earlier that night, so he had to retrieve an amount of drugs from the undergarments she was wearing.  As he gathered these items and his personal belongings, the victim had crawled to the kitchen, where the dog was located.  He claimed that he then grabbed the victim's legs and pulled her from the kitchen because he feared that the dog might bite her.  He then continued his search and located prescription medication, cocaine,

marijuana, and articles of drug paraphernalia, which he removed when he left the victim's house.

Appellant explained that he then drove to the home of a female with whom he was acquainted, who lived two or three blocks away. He asked her to call 9-1-1 for the victim, and he urged her to hold the drugs and gun for him. She agreed to make the telephone call but declined to accept the drugs and gun. The woman asked appellant to stay at her house with her children while she drove to a pay phone around the corner to make the call. Meanwhile, appellant attempted to wash the blood from his face because he intended to drive to the hospital when the woman returned. However, faced with the inability to locate a suitable place to leave the drugs and gun, appellant, then "drained" of energy, remained parked in the woman's driveway, "sitting there crying for a long time." Within a few hours, appellant drove to South Carolina because he "had a show booked . . . in Myrtle Beach."

Appellant denied having taken any other articles of the victim's property when he left her house. He contended that he did not intend to kill the victim because if he had so intended, "she had two guns in the house[,] [and] [s]he would be dead if [he] wanted to kill her . . . ." He asserted that he was aware that the victim did not enjoy a good reputation in the community with respect to peacefulness.

On cross-examination, appellant clarified that he did not disconnect his telephone call with Investigator McLeod. Rather, he explained, he had informed Investigator McLeod that the battery in his telephone was losing its charge and that it was going to power down, which was precisely what happened. Appellant also explained the circumstances under which he observed the victim in appellant's car with D., stating that he saw her "kissing on another man." He maintained that he only struck the victim one time on her head with the butt of the pistol and that her other injuries were the result of their mutual fight and of her striking the bathroom cabinet when he pushed her.

Following deliberations, the jury found appellant guilty of attempted voluntary manslaughter, false imprisonment, and aggravated assault, for which the trial court sentenced him to consecutive sentences of twelve years, eleven months and twenty-nine days, and fourteen years, respectively. This appeal follows.

## II. Analysis

Appellant presents one issue for our review: whether the State's evidence was sufficient to sustain his convictions for attempted voluntary manslaughter and aggravated assault. He does not contest the sufficiency of the evidence underlying his conviction for false imprisonment.

In his brief, appellant states that he "does not dispute that his convictions for Aggravated Assault and Attempted Voluntary Manslaughter stemmed from discrete events and involved different statutory elements, such that they would survive potential double jeopardy implications." As such, he maintains that the convicting evidence did not establish beyond a reasonable doubt that two separate assaults occurred. In creating an artificial division of appellant's attack on the victim, marked by the juncture at which the victim allegedly retreated and retrieved a gun, he seeks to argue that the first assault on the victim, in which he broke her nose, did not meet the statutory elements of aggravated assault.

Appellant's current position marks a departure from his argument at the sentencing hearing, at which he asserted that the dual convictions violated the principles of double jeopardy and that the doctrine of merger should apply to his convictions because "there was one act and one victim . . . . [T]hese actions happened actually very quickly." Specifically, at the sentencing hearing, appellant, relying on *State v. Denton*, 938 S.W.2d 373 (Tenn. 1996), argued that his convictions for attempted voluntary manslaughter and aggravated assault should merge. The State countered that *Denton* was inapplicable because the "proof in this case show[ed] that these offenses were not one continuous act. They were separate acts committed by the defendant over a period of time . . . ."[1] The trial court agreed with the State and ruled that "these actions in the . . . attempt to commit voluntary manslaughter and the aggravated assault were separate and discrete events and that one was not incidental to the other, . . . so therefore, . . . none of these convictions should merge."[2] Accordingly, appellant changed his tack at the hearing on the motion for new trial and on appeal in an attempt to advance an argument with which the trial court would agree. In doing so, however, appellant has adopted an incorrect position.

To be clear, contrary to the trial court's ruling, the attack on the victim did not consist of two separate and discrete events. Courts have interpreted the Double Jeopardy Clause as providing three distinct protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *Watkins*,

---

[1] We emphasize that pursuant to our review of the evidence at trial and the closing arguments, the State did not argue this theory to the jury. Moreover, during oral arguments in this case, counsel for appellant conceded that the State did not make the argument that the offenses arose as a result of two discrete acts until the sentencing hearing. Thus, the jury was never tainted by this incorrect statement of the law.

[2] We also note that the error committed by the State and perpetuated by the trial court occurred through no fault of their own. The correct analysis for review of a double jeopardy issue was announced by our supreme court on March 9, 2012, long after the trial of this case was concluded. *See State v. Watkins*, 362 S.W.3d 530 (Tenn. 2012). *Watkins* changed our State's double jeopardy analysis and abrogated the *Denton* rule.

-10-

362 S.W.3d at 541 (citations omitted). "Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense." *State v. Phillips*, 924 S.W.2d 662, 665 (Tenn. 1996). It is the third category that is implicated in the present case.

"The United States Supreme Court has declared that '[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.'" *Watkins*, 362 S.W.3d at 542 (quoting *Missouri v. Hunter*, 459 U.S. 359, 366 (1983)). In such cases, also known as "single prosecution cases," the Double Jeopardy Clause functions to prevent trial courts from fixing punishments in excess of that which was authorized by the legislature. *Watkins*, 362 S.W.3d at 542. "Single prosecution cases" lend themselves to claims of multiple punishment claims in two distinct ways, "unit-of-prosecution" and "multiple description" claims. *Id.* at 543. "Unit-of-prosecution claims arise when defendants who have been convicted of multiple violations of the *same* statute assert that the multiple convictions are for the 'same offense.'" *Id.* Our appellant at bar, as the appellant in *Watkins*, was convicted of violating two different statutes, requiring this court to employ an analysis of a "multiple description claim" on direct appeal. *See id.* "Multiple description claims arise in cases in which defendants who have been convicted of multiple criminal offenses under different statutes allege that the convictions violate double jeopardy because the statutes punish the 'same offense.'" *Id.* at 544.

In *Watkins*, our supreme court held:

> In multiple description cases, when determining whether two statutes define the same offense, the United States Supreme Court long ago declared that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."

*Id.* at 544 (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). An analysis of *Blockburger* examines "the statutory elements in the abstract, without regard to the proof offered at trial in support of the offenses." *Watkins*, 362 S.W.3d at 544. Under *Blockburger*, "[i]f each offense includes an element that the other offense does not, 'the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.'" *Id.* (quoting *Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975)); *see also Illinois v. Vitale*, 447 U.S. 410, 416 (1980) (noting that *Blockburger* "focuses on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial"). Our supreme court opined:

The *Blockburger* test has been credited with serving at least two purposes. First, the *Blockburger* test is described as remaining "loyal" to the text of the Double Jeopardy Clause, which proscribes multiple punishment for the "same offense" and does not proscribe multiple punishment for the "same conduct." Second, the *Blockburger* test has been characterized as preserving the appropriate separation of powers by focusing the analysis upon legislative intent, rather than upon a defendant's conduct or the proof introduced at a particular trial.

The *Blockburger* test also has been described as promoting "two important practical implications." First, because the *Blockburger* test evaluates the statutory elements of the offenses without reference to the proof offered at trial, "a motion to dismiss one count or one indictment based on multiple punishment grounds can be decided prior to trial by simply comparing the statutes, and a defendant who is charged improperly will not have to undergo the anxiety of a trial before the error is redressed." Second, because the *Blockburger* test focuses on statutory elements rather than proof, "a court can review a multiple punishment claim without a time-consuming review of the trial transcript."

*Watkins*, 362 S.W.3d at 544-45 (internal citations omitted).

The *Blockburger* test involves a two-step inquiry: (1) whether the alleged statutory violations arise from "the same act or transaction"; and (2) whether the crimes of which the defendant was convicted constitute the same offense. *Id.* at 545 (quoting *Blockburger*, 284 U.S. at 301-04). "Where each statutory offense includes an element not contained in the other, the offenses are distinct. Where the offenses are distinct under *Blockburger*, the legislature is presumed to have intended to allow the offenses to be punished separately." *Id.* at 545-46. However, "the presumptions supplied by *Blockburger*, either in favor of multiple punishment if the statutory offenses are distinct, or against multiple punishment if the statutory offenses are the same, may be overcome by explicit declarations of legislative intent." *Id.* at 546.

In Tennessee, we have explicit declarations of legislative intent. *See id.* at 556, n.44, & 557, n.47.[3] "[I]f each offense includes an element that the other does not, the statutes do not define the 'same offense' for double jeopardy purposes, and we will presume that the Legislature intended to permit multiple punishments." *Id.*

> "In nearly all cases involving multiple description claims, application of the *Blockburger* test will provide a definitive answer to the question of whether the Legislature intended to permit multiple convictions under separate statutes. In the rare case where doubt as to legislative intent remains after application of the *Blockburger* test, courts may consider other evidence of legislative intent, including the purposes and history of the relevant statutes."

*Id.* It is therefore unnecessary to speculate about whether our legislature intended to permit multiple convictions for aggravated assault and attempted voluntary manslaughter. The General Assembly has spoken with regard to what offenses constitute lesser included offenses and what offenses may not be jointly prosecuted.

Notably, in abrogating the *Denton* analysis, the *Watkins* court addressed the second factor — an analysis of the evidence used to prove the offenses — and stated it was ineffective in ascertaining legislative intent, the key consideration in multiple punishment cases. *Id.* at 552-553 ("Indeed, it is difficult to conceive of how reviewing the evidence and circumstances of a particular criminal case aids a court in ascertaining legislative intent with respect to multiple punishment cases."). This is the sort of analysis that would lend itself to a separate due process analysis, which it seems is now expressly foreclosed by *Watkins. See, e.g., State v. Larry Jereller Alston, Kris Theotis Young, and Joshua Edward Webb*, No. E2012-00431-CCA-R3-CD, 2013 WL 2382589 (Tenn. Crim. App. May 30, 2013) (citations omitted) (concluding that even before abrogation, the due process analysis of *State v. Anthony*, 817 S.W.2d 299, 305 (Tenn. 1991), and its progeny "had been expressly limited to those cases involving the propriety of a separate conviction of kidnapping"), *perm. app. granted* (Tenn. Jan. 17, 2014); *State v. Ralph*, 6 S.W.3d 251, 255 (Tenn. 1999) (concluding that "the principles of due process offended in *Anthony*" were not implicated by convictions for burglary and theft); *State v. Barney*, 986 S.W.2d 545, 548 (Tenn. 1999) (stating that "the

---

[3] Tenn. Code Ann. § 39-14-404(d) (expressly limiting prosecution to proceeding under this code section *or* other applicable code sections, but not both) (emphasis added); *id*. § 39-14-149(c) (allowing prosecution pursuant to this code section or theft of services, but not both); *id*. § 39-12-204(e); *see also id*. § 40-18-110(g)(1), (2) (stating that second degree murder is a lesser included offense of first degree murder and that voluntary manslaughter is a lesser included offense of first and second degree murder); § 40-18-110(g)(3) (noting that aggravated sexual battery is a lesser included offense of aggravated rape); *id*. § 40-18-110(g)(4) (concluding that sexual battery and sexual battery by an authority figure are lesser included offenses of rape and aggravated rape).

'essentially incidental' test, as developed in *Anthony* and its progeny, [was] not helpful in the context of sexual offenses"), *abrogated on other grounds by Watkins*, 362 S.W.3d at 550;; *State v. John Brunner*, No. W2008-01444-CCA-R3-CD, 2009 WL 2151822, at *11 (Tenn. Crim. App. July 17, 2009) (declining to apply *Anthony* to separate convictions of second degree murder and domestic violence); *State v. Floyd Perrow*, No. M2003-00319-CCA-R3-CD, 2004 WL 193059, at *11 (Tenn. Crim. App. Jan. 24, 2008) (declining to apply *Anthony* to separate convictions of aggravated burglary, aggravated rape, and aggravated assault); *State v. Reginol L. Waters*, No. M2001-02682-CCA-R3-CD, 2003 WL 1191866, at *15 (Tenn. Crim. App. Jan. 30, 2003) (concluding that *Anthony* did not preclude a conviction for aggravated burglary as "essentially incidental" to aggravated rape and aggravated robbery"); *State v. Cowan*, 46 S.W.3d 227, 234 (Tenn. Crim. App. 2000) (declining to extend *Anthony* to convictions for attempted first degree murder, aggravated burglary, and attempted especially aggravated robbery").

Employing our supreme court's reasoning, we conclude that because aggravated assault and attempted voluntary manslaughter each require proof of a fact not required in proving the other, the offenses are not multiplicitous and the dual convictions do not violate the prohibition against double jeopardy. *See* Tenn. Code Ann. §§ 39-12-101, -13-102, -13-211; *Watkins*, 362 S.W.3d at 545-46 (citing *Blockburger*, 284 U.S. at 304) (noting that if each offense includes an element not contained in the other offense, the statutory offenses are distinct). In addition, legislative intent does not preclude the dual convictions. The State properly charged appellant with violation of two separate criminal statutes based on one continuous course of conduct, contrary to the trial court's interpretation. The trial court properly declined to merge the convictions because each statute punishes different criminal behavior, not because the two offenses were based on separate, discrete events.

Accordingly, our review of the sufficiency of the evidence necessarily involves application of the evidence presented at trial to the statutory elements of each crime. In doing so, we apply the standard of appellate review set forth in *Jackson v. Virginia*: "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

-14-

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

The jury convicted appellant of aggravated assault. As relevant to his conviction, a person commits aggravated assault who intentionally or knowingly causes serious bodily injury to another. Tenn. Code Ann. §§ 39-13-102(a)(1)(A)(i), -13-101(a)(1). Serious bodily injury is a bodily injury that involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; [or] protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. *Id.* § 39-11-106(a)(34)(A)-(E).

The evidence presented at trial established that appellant intentionally struck the victim several times. He admitted to hitting her in the face, breaking her nose. He further acknowledged that he hit the victim on the head with the butt of a gun. Her other injuries, he claimed, were sustained as a result of their mutual physical fight. He also confessed to pushing the victim into the bathroom with tremendous force, causing her to collide with the vanity. The victim explained, to the best of her memory, the repeated blows she suffered at appellant's hands. The evidence of her serious physical injury was overwhelming: the victim testified concerning her loss of consciousness, pain, scars, and permanent physical conditions; Mr. Courtney explained the condition in which he first witnessed the victim, as well as the lingering effects of the assault; and medical personnel discussed the severity of the victim's injuries. Viewed in the light most favorable to the State, the evidence was sufficient to support appellant's conviction for aggravated assault beyond a reasonable doubt.

A defendant is guilty of criminal attempt to commit a crime when he or she, acting with the kind of culpability otherwise required for the offense:

(1)     Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2)     Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3)     Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a). "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." *Id*. § 39-13-211(a).

The evidence adduced at trial and credited by the jury established that appellant, acting in a state of passion produced by adequate provocation, acted with the intent to cause a result — the death of the victim — believing that his assault upon her would cause said result. In a rage over being "disrespected," appellant assaulted the victim. First, he broke her nose; he then "pistol-whipped" her and subsequently inflicted several other serious injuries. He bound the victim's feet to an entertainment center by use of an electrical cord and taunted her about seeking medical help for her. After staging a false 9-1-1 call from a female acquaintance, appellant then fled the State and was apprehended weeks later in South Carolina. Viewed in the light most favorable to the State, the evidence supports appellant's conviction for attempted voluntary manslaughter.

## CONCLUSION

Based on our review of the record, the parties' briefs, the arguments of counsel, and relevant legal authorities, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE